UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,                                                    CASE NO. 8:20-cr-35-T-02TGW

v.

TODD COROUTHERS

    Defendant.
_____/

**MR. TODD COROUTHERS' REQUEST FOR A DOWNWARD DEPARTURE
PURSUANT TO USSG §5H1.3 AND §5K2.13 AND
<u>A SENTENCE OF 36 MONTHS BUREAU OF PRISONS</u>**

    Intellectual disability and mental illness remains a stigma in many communities. For Todd Corouthers, an intellectually disabled adult with diagnosed mental health issues, admitting that he needed support and treatment meant admitting that there was something wrong with him—that he was weak. His unwillingness to get help led to early involvement with the criminal justice system. Something that still haunts him today as he has found himself deeply entrenched in that same system. The Catch-22 for Todd was that his lack of treatment led to his arrests which afforded him the opportunities to get medication for his mental illness. Unfortunately, though he remained dedicated to taking his medication every time he was released from jail or prison, practically speaking, Todd did not have the resources to follow through. With no job skills, no property, no means of transportation or even a valid driver's license, he had to lean on his mother and sister to help him. And, their help was not always available. As a result, when he

1

was not incarcerated, his medication use would become sporadic. Which would, of course, send him back to jail on a subsequent criminal charge that would inevitably result from his lack of medication. Todd is stuck in a vicious cycle. We are asking this Court to break that cycle. With a sentence of 36 months Bureau of Prisons, we can ensure that Todd learns job skills at the Bureau of Prisons, gets treatment for his mental health issues, and, with a follow on term of supervised release, we can guarantee that he commits to his medication regimen and a new lifestyle.

I. **As a person with Borderline Intellectual Functioning, Todd's opportunities in life have been limited and his contacts with the criminal justice system have increased.**

To a person with intellectual disability, the world is a difficult place to navigate. Being illiterate makes it nearly impossible to obtain (and keep) a job. This is the world that Todd Corouthers lives in. When he was as young as six years old, he was placed in the exceptional student program for learning disabled children. *See Def. Ex. A, School Records.* By the time he got to high school, he no longer was assigned grades in his courses. *Id.* He never graduated from high school and his illiteracy has made it impossible for him to get his GED. As a result, the only job he was ever able to obtain was that of a paper shredder. And, he kept that job for less than one month. PSR ¶90.

"Studies suggest that people who suffer from intellectual disabilities are disproportionally involved in crime as *both* perpetrators and victims."[1] Males with

---

[1] Fogden, B.C., Thomas, S.D.M., Daffern, M. *et al.* Crime and victimisation in people with intellectual disability: a case linkage study. *BMC Psychiatry* **16,** 170 (2016). https://doi.org/10.1186/s12888-016-0869-7.

intellectual disability are three times more likely than males without an intellectual disability to have a prior criminal conviction. *Id.* Todd's early contacts with law enforcement began when he was thirteen years old. During his time as a juvenile offender, he went to at least two juvenile programs. PSR ¶¶25, 50. While his parents would report to the juvenile court system that he was a good kid, he nevertheless would continue to get himself into trouble. When he was eighteen years old, he was arrested for Possession of Cocaine. PSR ¶28. His court appointed attorney recognized that Todd had intellectual disabilities and filed a motion with the court to have him evaluated for mental retardation. As a result, Todd was sent to the Florida State Hospital in Chattahoochee for competency training.

Even though he had experience with the juvenile system, nothing could prepare Todd for what he would see at the Florida State Hospital. He was placed in a room with five other adult men. Some of them would walk around like zombies, not talking due to the heavy sedation from medications they were taking. Other patients in the hospital were severely mentally ill and their actions demonstrated this. Todd found the experience scary. He was there for six months until he was "restored to competency." In those six months, he never saw his family since they did not have the money to make the drive north past Tallahassee to visit him.

More than that, the only goal of the Florida State Hospital was to train Todd to become "mentally competent" to proceed in court—not to assist him in getting social security benefits or other needed resources. One exposé on the Florida State Hospital noted that "[a]fter paying for months of 'competency training,' the state

3

makes it easy for patients who get out to relapse in just a few days. It releases many of them with no place to live and no support—not even enough medication to last the 30 days experts say it typically takes to schedule a doctor's appointment to get more."[2]

Even more disheartening is that—despite a Court finding that he was intellectually disabled when he was eighteen years old—it was not until ten years later, at the age of twenty eight, that Todd finally applied for Social Security Administration's Supplemental Security Income ("SSI") based on this disability. He did this without any assistance from a social worker or legal aid organization—he had his father help him fill out the paperwork and, as is not unusually, was initially denied. *See* Def. Ex. B, Disability Denial. He then had to appeal the denial was not granted SSI until 2015—two years after his initial application. *See* Def. Ex. C, Disability Granted.

Todd fell victim to a vicious cycle. Because of his reduced capacity, his contacts with law enforcement increased. And, his intellectual disabilities made it difficult for him to obtain and keep employment. As a result, he had very few options in life. With a criminal history and no work skills, Todd had very little future.

II. **There is a stigma associated with Mental Illness in the African American Community, but this Court can help Todd overcome this and give him the resources he needs to succeed.**

---

[2] Braga, Michael, et al. "Definition of Insanity: Florida spends millions making sure the mentally ill go to court – and gets nothing for it." *Tampa Bay Times*. Dec. 18, 2015. Article found at: http://projects.heraldtribune.com/florida-mental-health-hospitals/competency/

Studies demonstrate that "the Black community suffers from an increased rate of mental health concerns, including anxiety and depression. The increased incidence of psychological difficulties in the Black community is related to the lack of access to appropriate and culturally responsive mental health care, prejudice and racism inherent in the daily environment of Black individuals, and historical trauma enacted on the Black community by the medical field."[3] In fact, the African American community is 20% more likely to fall victim to mental health problems such as Major Depressive Disorder and Generalized Anxiety Disorder. *Id.* Despite this, there remains a stigma within the community to seek out and continue mental health treatment. "One study showed that 63% of Black people believe that a mental health condition is a sign of personal weakness. As a result, people may experience shame about having a mental illness and worry that they may be discriminated against due to their condition."[4] This stigma affected Todd.

As was previously mentioned, his initial contacts with mental health treatment were always while he was incarcerated. Once he was released from custody, he struggled to practically and emotionally find the drive to continue with treatment. He understands that this must change. He is tired of having spent the majority of his life in custody and wants to become a stable, hard-working member of society. But he will need help to do this. The Bureau of Prisons have multiple

---

[3] Vance, Thomas. "Addressing Mental Health in the Black Community." Columbia University: Department of Psychiatry. Feb. 8, 2019. Found at https://www.columbiapsychiatry.org/news/addressing-mental-health-black-community

[4] National Alliance on Mental Illness. "Identity and Cultural Dimensions: Black/African American." Last viewed January 11, 2021. Found at https://www.nami.org/Your-Journey/Identity-and-Cultural-Dimensions/Black-African-American

programs that can help Todd.

First, he can enter the Skills Program. Defense counsel has already coordinated with the Skills Program director at Coleman, Dr. Benitez, and Todd has been accepted into that program. *See* Def. Ex. D, Acceptance. The Skills Program is a "residential treatment program designed to improve the institutional adjustment of inmates with intellectual disabilities and social deficiencies." *See* Def. Ex. E, Skills Program Information. This program uses cognitive behavioral therapy to assist inmates with successful reentry into the community. *Id.* It is 12-18 months long and inmates attend for 20 hours per week. It falls under the umbrella of the Mental Health Treatment Program at the Bureau of Prisons. As a result, the inmates who participate in the Skill Program are housed separately from the general population in a community that "supports prosocial attitudes and behaviors . . . [and] isolates program participants from the negative peer pressure of the large prison environment."[5]

Second, Todd can benefit from the Literacy Program at BOP. The Literacy Program is the first step towards obtaining his GED in prison. The program meets for one and a half hours per day and an inmate must perform at least 240 hours in the program or as many hours as necessary to ultimately obtain their GED. *See* Def. Ex. F, Literacy Program. Teaching Todd to read and write and giving him the ability to obtain his GED will drastically change his life.

---

[5] *See* U.S. Department of Justice, Federal Bureau of Prisons. Program Statement 5330.11: Psychology Treatment Programs. April 25, 2016. Sect. 6.1.2. Found at https://www.bop.gov/policy/progstat/5330.11.pdf.

Third, Todd can obtain job training so that he can obtain employment once he is released. As this Court is well-aware, the Bureau of Prisons has numerous occupational programs that an inmate can participate in. Todd would like to serve his time at Coleman because that has the Skills Program and is relatively close to his family in the Tampa area. Between all the Coleman facilities, there are over fifty occupational programs for inmates.[6]

### III. His BIF and Mental Illnesses qualify him for Downward Departures under USSG §5H1.3 and §5K2.13.

There are two provisions in the United States Sentencing Guideline Manual that could apply to Todd which would permit this Court to give him a downward departure of 36 months Bureau of Prisons.

First, USSG Section 5H1.3 provides that:

> Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines.

Todd's case falls under this provision. He has suffered from both mental illness and intellectual disabilities for his entire life. In *United States v. Rothwell*, 847 F.Supp. 2d 1048 (E.D. Tenn. 2012), the Court applied 5H13 and granted a four-level downward departure based on the defendant's mental capacity in a child pornography case. The Defendant there had an IQ of 77, "he spelled at a third-grade

---

[6] Some of these programs are duplicates between the Coleman facilities. For a list of the programs and breakdowns per Coleman facility, please refer to Federal Bureau of Prisons, Occupational Training Directory found at
https://www.bop.gov/inmates/custody_and_care/docs/inmate_occupational_training_directory.pdf.

level, comprehended sentences at the seventh-grade level, read at an eighth-grade level, and performed math at a fourth-grade level." *Id.* at 1062. In so ruling, the Court cited the United States Supreme Court in *Atkins v. Virginia* which held that "[b]ecause of their disabilities in areas of reasoning, judgment, and control of their impulses ... [mentally retarded persons] do not act with the level of moral culpability that characterizes the most serious adult criminal conduct." *Atkins,* 536 U.S. 304, 307 (2002). In comparison, Todd has a full-scale IQ of 59. PSR ¶74. He cannot read and write, as aforementioned. PSR ¶86. And, he dropped out of high school after the ninth grade. PSR ¶87. He has previously been diagnosed with schizoaffective disorder and bipolar disorder. PSR ¶¶77, 79. Additionally, he has documented mental illnesses of: major depression, schizoaffective disorder, bipolar disorder, and generalized anxiety.

    Second, USSG Section 5K2.13 provides, in part, that:

> A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

"The Commission's policy statement on mental and emotional conditions compliments USSG § 5K2.13, which identifies diminished capacity as a basis for downward departure on the ground that it may not have been taken into consideration otherwise in calculating the guidelines range." *United States v. Ferguson*, 942 F. Supp. 2d 1186, 1192 (M.D. Ala. 2013). The reasoning behind this is

that there is a wide spectrum between an individual being so disabled that he or she is not competent and an individual having the intellectual abilities that the general public has. Within this spectrum, there are clearly people who function at a diminished level. Todd is one of those people. Additionally, the oft-cited rationales behind criminal justice sentences are reduced in efficacy for people with diminished capacity. The Ninth Circuit addressed this in *United States v. Cantu*, 12 F.3d 1506 (9th Cir. 1993) (citing *United States v. Chatman,* 986 F.2d at 1452 (citing *United States v. Poff,* 926 F.2d 588, 595 (7th Cir.1991) (en banc) (Easterbrook, J., dissenting))), stating:

> Desert (blameworthiness) loses some bite because those with reduced ability to reason, or to control their impulses, are less deserving of punishment than those who act of viciousness or greed. Deterrence has less value ... because people with reduced capacities are less susceptible to a system of punishment and reward: the grip of their disorders may make them less able both to identify and to conform their actions to an appropriate course of conduct.

The amended guidelines reflects the recognition that mentally ill criminal defendants need to be treated instead of imprisoned—a benefit that inures to society as well. "Providing comprehensive, effective treatment for those mentally ill defendants whose disorder drives their criminality will more likely protect the public from suffering future crime—and that treatment does not come from incarceration." *Ferguson*, 942 F. Supp. 2d at 1194.

An evaluation by Dr. Valerie McClain notes that Todd's "reduced mental capacity contributed to commission of this instant offense." *See* Def. Ex. G, McClain evaluation.  In her professional opinion, his intellectual disability limited his

9

appreciation for the consequences of the offense. Dr. McClain will testify at the sentencing hearing and provide more information to the court as well as statistics that support this assertion.

**IV.    Application of USSG 2K2.1(a)(4)(A), while legally permissible, is not appropriate in this case due to the nature of the prior offense.**

The guideline application to the instant offense is United States Sentencing Guideline §2K2.1. The base offense level in this case is properly calculated as 20. However, but for a $60 sale of crack cocaine that happened six years ago, the base offense level applicable in this case would have been 12. USSG §2K2.1(a)(7); *see* Def. Ex. H. This would make his total offense level a 10, with criminal history category VI, his guideline range would have been 24-30 months Bureau of Prisons.

The original 1987 version of USSG §2K2.1 set the base offense level at nine with no additional offense-level enhancements based on prior convictions. *See* U.S. SENTENCING GUIDELINES MANUAL § 2K2.1 (1987). These enhancements arose following the 1990 Firearms and Explosives Materials Working Group Report, which noted that judges were (at the time) sentencing firearms offenders to upward departures in 8.4% of the cases and sentencing these same offenders to the high level of the guidelines in nearly twenty five percent of the cases. *See* U.S. SENTENCING COMM'N, FIREARMS AND EXPLOSIVE MATERIALS WORKING GROUP REPORT 8-11 (1990). As a result, the guideline was amended. The enhancements then had the effect of increasing the average sentences for firearms cases from 28 months in 1989 to eighty-four months in 2008. Simultaneous with this increase in average sentence, though, was an increase in the rate of departures

10

given to firearms offenders, from 14.5% of sentences warranting a departure in 2007 to 17.3% post- *Kimborough* and *Gall*. Section 2K2.1(a)(4)(A) is a classic example of a recidivist sentencing enhancement allegedly justified by the need for deterrence, incapacitation and retribution, that is now being called into question.[7]

## V. Conclusion

Post-*Booker* and its progeny, the United States Supreme Court made clear that federal courts could consider factors in sentencing a defendant outside of the guidelines. In this case, Todd exhibits both intellectual deficits and mental health issues that qualify him for two Guideline-based departures. However, even if this Court determines that these departures do not apply in this case, the Court has discretion and can help provide a sentence that will both punish Todd but also help him correct course. The Defense believes that a 36 month Bureau of Prison sentence will accomplish this goal.

Dated this 11th day of January 2021.

Respectfully submitted,

JAMES T. SKUTHAN
ACTING FEDERAL DEFENDER

*/s/ Jessica Casciola*
Jessica Casciola
Assistant Federal Defender
Florida Bar No. 40829
400 North Tampa Street, Suite 2700
Tampa, FL. 33602
Telephone: 813-228-2715
Fax: 813-228-2562

---

[7] For a thorough discussion of the topic of recidivist sentencing enhancements within the Federal Guidelines, please see: Russel, Sarah French, "Rethinking Recidivist Enhancements: The Role of Prior Drug Convictions in Federal Sentencing." University of California: Davis. Vol. 43: 1135. 2010.

Email: Jessica_Casciola@fd.org

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 11th day of January 2021, a true and correct copy of the foregoing was furnished by CM/ECF to with the Clerk of the Court, which will send notice of the electronic filing to the following:

Randall Leonard, AUSA

*/s/ Jessica Casciola*
Jessica Casciola
Assistant Federal Defender